IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| HAROLD R. BAILEY, | § | |
|     PLAINTIFF, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:08-CV-500-Y |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
|     DEFENDANT. | § | |

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff Harold R. Bailey filed this action pursuant to Sections 405(g) and 1383(c)(3) of

Title 42 of the United States Code for judicial review of a final decision of the Commissioner of

Social Security denying his claims for disability insurance benefits under Title II and

supplemental security income or SSI benefits under Title XVI of the Social Security Act.  On

September 30, 2003, Bailey applied for disability insurance[1] and SSI benefits, alleging that he

became disabled on November 1, 1992.  (Transcript ("Tr.") 15, 105-07, 340.)  His applications

_____

[1] Bailey last met the insured status requirements on September 30, 1994.  (Tr. 18.)

1

were denied initially, on reconsideration, and in an ALJ decision dated September 13, 2005.  (Tr. 15, 35-46, 53-68, 338-59.)  Bailey filed a written request for review, and the Appeals Council, on June 10, 2006, vacated the ALJ decision and remanded the case for further proceedings.  (Tr. 15, 49-52, 91.)   On November 3, 2005, while his appeal was pending, Bailey filed a subsequent application for SSI, with a protective filing date of October 18, 2005.  (Tr. 15, 362.)  This subsequent application was consolidated with Bailey's previously filed claims because he alleged the same onset date of November 1, 1992.  (Tr. 15, 362.)  The ALJ held a hearing on February 27, 2007 and issued a decision on April 26, 2007 that Bailey was not disabled and was not entitled to disability or SSI benefits because he was capable of performing work that existed in significant number in the national economy for all relevant periods applicable to his claims.  (Tr. 12-29, 360-87.)  The Appeals Council denied Bailey's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner.  (Tr. 4-10.)

B.     STANDARD OF REVIEW

        Disability insurance is governed by Title II, 42 U.S.C. § 401 *et seq.*, and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the Social Security Act.[2]  The Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity.   42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).   To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.   20 C.F.R. §§ 404.1520, 416.920 (2009).   First, the claimant must not be

_____

[2] In addition, numerous regulatory provisions govern disability insurance and SSI benefits.  *See* 20 C.F.R. pt. 404 (disability insurance); 20 C.F.R. pt. 416 (SSI).  Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI."  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix[3] to the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th

---

[3] The Listing of Impairments is found at 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.    ISSUES

1.    Whether the ALJ erred in relying on a 2005 state agency medical opinion that was not from an acceptable medical source relevant to all the alleged period of disability.

2.    Whether the ALJ erred with respect to Bailey's claims for SSI by failing to obtain an acceptable medical source opinion from a designated state agency physician on the issue of medical equivalency.

3.    Whether the ALJ erred by not applying the applicable factors in 20 C.F.R. § 404.1527(d) in rejecting a medical opinion from a treating source opinion and a consult examination report.

D.    ADMINISTRATIVE RECORD

1.  Relevant Treatment History

On August 19, 1994, Bailey, who had been suffering from hip and leg pain, had an MRI taken of his cervical spine ("C-spine"), which showed the following: "Very minimal spurring at C3-4 with no encroachment.  C5-6 and C6-7 spurring predominately on the right causing some encroachment upon the right lateral recess at these two levels.  No disc herniation is noted." (Tr. 204; *see also* Tr. 196.)  An MRI of Bailey's lumbar spine ("L-spine"), also performed on August 19, 1994, showed water loss and degenerative changes and a small left-sided disc herniation at the L5-S1 level that was causing encroachment upon the left lateral recess.  (Tr. 204.)  Radiology

reports dated August 19, 1994, showed that Bailey's cervical spine appeared to be within normal limits and that his lumbar spine was normal.  (Tr. 206-07.)

In November 1994, Bailey sought medical treatment, stating that he had pain and numbness in both legs with prolonged standing and aches and pains in both arms.  (Tr. 201.) Victor Flores, M.D., opined in an Electromyography & Nerve Conduction Study performed on November 29, 1994 that there was no conclusive evidence of radiculopathy[4] or neuropathy in Bailey's lower extremities.  (Tr. 201.)  Flores also stated that a motor examination of Bailey's lower extremities was within normal limits and that Bailey's "[s]traight leg raising was negative bilaterally."  (Tr. 201.)

Later, on December 28, 1994, Michael Wimmer, M.D., performed an electromyography and nerve conduction study on Bailey in which he opined that "[e]lectrodiagnostic studies are suggestive of right C7 radiculopathy."  (Tr.198; *see also* Tr. 199-200.)  During the examination, Wimmer noted that Bailey's strength in his bilateral upper limbs was a 5/5 with the exception of 4+/5 weakness of the right elbow extensors and right wrist flexors.  (Tr. 199; *see also* Tr. 21.)

From August 1994 through July 1999, Bailey was treated for various issues relating, *inter alia*, to his neck and back pain in which he often complained of pain in his extremities, especially in his right arm and hand.  (Tr. 179, 182-86, 188-91, 194-95, 203, 205-06.)  During this period of time, he experienced some tenderness in his right shoulder and upper extremity and had slight decreased sensation of his right upper extremity.[5]  (*Id.*)  He also experienced some

---

[4] Radiculoapathy is disease of the nerve roots and nerves.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1595 (31st ed. 2007).

[5] In December 1994, one doctor noted: "R UE—strength 5/5 deltoid, triceps, biceps.  Sensation intact to LT, PP and proprioception.  Reflexes 2+ and symmetric-biceps, triceps . . . .  Minimal triceps reflex . . . .  [No]

5

increase in his pain and limited range of motion in his neck, especially in 1997 and 1998.  (*Id.*; *see also* Tr. 21.)

Bailey went to the emergency room on June 16, 2003 complaining of severe neck and lower back pain.  (Tr. 170, 237-38.)  He stated that he could not move his legs or toes or stand up.  (*Id.*)  A radiology report indicated that Bailey had "mild to moderate disc space narrowing at L5-S1."  (Tr. 170.)  In early July 2003, Bailey was seen by Koren Weston, D.I., who prescribed back exercises and referred Bailey to James Barbee, M.D.  (Tr. 237-38.)

On July 22, 2003, Husam Alkhersam, M.D., at the request of Weston, conducted an EMG and nerve conduction study for cervical and lumbosacral radiculopathy on Bailey.  (Tr. 234-36.) In his findings, Alkhersam stated, "Normal study.  There is no electrodiagnostic evidence of a left cervical radiculopathy or lumbosacral radiculopathy."  (Tr. 236.)

An MRI of the L-spine taken on August 9, 2003, also at the request of Weston, indicated:

> 1.      L4-5 level mild disc desiccation[6] with diffuse posterior disc bulge, causing slight indentation effect on the anterior aspect of the thecal sac. However, bilateral lateral recess stenosis[7] and moderately severe foraminal narrowing is noted on both sides.  Moderately severe facet arthrosis is also identified at this level.

> 2.      L5-S1 level marginal spurs with endplate ridging and diffuse posterior disc bulge is seen extending more towards the left side, producing compression effect & deformity of the thecal sac, left more than right, with

---

evidence of atrophy on the R vs. the L."  (Tr. 185.)   Later, in July 1995, another doctor diagnosed him with "chronic C-7 radiculopathy."  (Tr. 191.)  In September 1995, another doctor found that he was weak in his right deltoid (4/5) and right bicep (4+/5).  (Tr. 190.)  In 1997, Bailey requested a referral to the surgery clinic (Tr. 186); however, he indicated in January 1999 that he wanted to postpone surgery on his back.  (Tr. 182.)  In 1998, an EMG of Bailey's Nerve Conduction showed that the nerve conduction study was abnormal "secondary to the slowing of the right ulnar motor conduction velocity across the elbow segment."  (Tr. 193.)

[6] Desiccation is "the act of drying."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 507 (31st ed. 2007).

[7] Stenosis is an abnormal narrowing of a canal or duct.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1795 (31st ed. 2007).

bilateral lateral recess stenosis, left more than right, as well as severe foraminal narrowing.  Left more than right.

(Tr. 229-30.)

An MRI of the C-Spine, also taken on August 9, 2003, indicated, "Severe spondylosis C3-4, C5-6 and C6-7 levels especially at C5 through C7[,] [c]ord compression at C5-6 and C6-7 levels[, and s]pinal stenosis at C5 through C7 level."  (Tr. 231-32.)

On August 18, 2003, Bailey was seen by Barbee for low back pain, tingling legs, and paresthesias[8] into the lower extremities.  (Tr. 167-69.)  During the physical examination, Barbee noted that Bailey's reflexes were 2+ bilaterally, his muscle strength was 5/5 bilaterally, and that he has a "positive straight leg raise on the left."  (Tr. 167.)  Barbee also stated that "[s]ensory is intact bilaterally but with altered sensations on the left lateral lower extremity."  (*Id.*) In his assessment, Barbee stated that Bailey had "lumbar disk disease and foraminal stenosis with radicular symptoms" and referred Bailey to the orthopedic spine clinic for a surgical referral. (Tr. 167; *see also* Tr. 169.)

On September 3, 2003, Weston diagnosed Bailey with spinal stenosis and facet arthropathy[9] and prescribed him a back brace for lumbar support.  (Tr. 227-28.)  Later, on September 11, Weston treated Bailey for pain in his lower back that Bailey claimed worsened when he drove a car or walked.  (Tr. 219.)  Weston noted that Bailey was seen for "severe paravertebral muscle spasms lumbar—lower thoracic . . . moderate [to] severe tenderness of lumbar spine & paravertebral muscles, extreme difficulty moving legs . . . ."  (Tr. 219-20.)

---

[8] Paresthesia is an "abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1404 (31st ed. 2007).

[9] Arthropathy is any joint disease.   DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 160 (31st ed. 2007).

On a form titled "Medical Release/Physician's Statement" in connection with Bailey's application for a medical program with the Texas Department of Human Services, Weston diagnosed Bailey, on September 11, 2003, with severe degenerative disease of the L and C-spine and lumbar spinal stenosis.  (Tr. 218.)   In addition, Weston noted that Bailey had difficulty sitting, standing, walking, bending, and carrying weight, and Weston opined that Bailey was permanently disabled as of 1993 and could not work.  (Tr. 218.)

On November 18, 2003, S. Spoor, M.D., a medical consultant for the Social Security Administration ("SSA"), stated in a Physical Residual Functional Capacity Assessment (Form SSA-4734-BK) ("RFC Assessment") that Bailey was being treated for low back pain and gave a secondary diagnosis of "cervical DDD & stenosis."  (Tr. 154-161.)  Spoor indicated that the RFC Assessment was for a current evaluation and that Bailey was last insured on September 30, 1994. (Tr. 154.)  In the RFC Assessment, Spoor stated that Bailey could occasionally lift and/or carry fifty pounds, frequently lift and/ or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, engage in unlimited pushing and/or pulling, and occasionally climb, balance, stoop, kneel, crouch, and crawl.[10]   (Tr. 155-156.)  This report was affirmed as written by Albert Ponterio, M.D., on March 4, 2004.   (Tr. 161.)   Spoor also signed a Disability Determination and Transmittal ("DDT") form on November 18, 2003 (Form SSA-831-U3) that indicated that Bailey

---

[10]  Spoor indicated that the evidence supporting his conclusions came from an August 18, 2003, examination that showed Bailey's reflexes were 2+ bilaterally, his muscle strength was 5/5 bilaterally, and that he had a positive straight leg raise on the left.  (Tr. 155.)  Spoor also stated that "[t]he alleged limitations caused by the claimant's symptoms are not fully supported by MER/EOR."  (Tr. 159.)

was not disabled through September 30, 1994.[11]   (Tr. 33.)

In December 2003 and January 2004, Bailey was treated for rectal bleeding, which began after he had walked less than a mile and continued after he did some heavy lifting.  (Tr. 215-17.)  On March 3, 2004, Bailey sought medical treatment for back pain.   (Tr. 213-14.)   Bailey complained that he still had numbness and tingling in his left arm and that he could not tolerate sitting for more than two hours.  (Tr. 213.)   He was prescribed medication for the pain and referred to the orthopedic clinic.  (Tr. 213-14.)

In a letter addressed to "To Whom It May Concern" dated March 3, 2004, Weston stated, "Mr. Harold Bailey is my patient and has been in my care for the last year.   He has MRI evidence of severe back and neck disease and is permanently disabled.   He is unable to walk, stand, or sit for more than one to two hours."  (Tr. 210.)  On March 4, 2004, Ponterio signed a DDT form diagnosing Bailey with cervical degenerative disc disease with stenosis and indicating that he was not disabled through September 30, 1994.[12]  (Tr. 34.)

Bailey was seen on April 21 and 23, 2004, for low back pain.  (Tr. 163, 165.)  Bailey complained that the pain was going down the back of both legs and that the pain was worse when he was sitting or walking.  (*Id.*)  The doctor who examined Bailey on both days indicated that Bailey's hip flexion was 4/5 on the right, with 3/5 leg extension and made an assessment of "L4/5, L5/S1, Disc herniation."  (Tr. 165.)

From August 2004 through June 2005, Bailey continued to be treated for chronic low back and neck pain.  (Tr. 265-66, 287-90, 293.)  In an examination performed on June 24, 2005,

---

[11] The DDT form was also signed on November 17, 2003, by Michael Dunlap, a Disability Examiner.  (Tr. 33.)

[12] The DDT form was also signed on March 1, 2004 by Yolanda Garza, a Disability Examiner.  (Tr. 34.)

the doctor noted that Bailey's motor strength was 4/5 to 5/5 and that his sensation was decreased in "lateral aspect of foot." (Tr. 259-60.)

On July 1, 2005, Arlan Larson, M.D., examined Bailey for low back and neck pain at the request of the state disability examiner. (Tr. 239-40.) Larson opined that Bailey had "[p]ain in the neck and low back secondary to first radiculopathy cervical in the neck mostly left of C6, C7 and C8" and "[p]ain in the low back secondary to radiculopathy lumbar L4, L5, and S1 bilaterally." (Tr. 240.) Larson also noted that Bailey could bend over about forty-five degrees, could not squat in the position of forty-five degrees, could bring his knees twenty degrees toward his chest, could raise his legs straight up and down and raise them thirty degrees on both sides, could not do a sit-up or touch his toes, and could raise the opposite leg thirty degrees when lying on either side of his body. (Tr. 240.) Larson also opined in a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" that Bailey could occasionally lift/and or carry ten pounds, frequently lift and/or carry less than ten pounds, stand and/or walk less than two hours in an eight-hour workday, must periodically alternate sitting and standing to relieve pain or discomfort, could never climb, kneel, crouch, crawl, or stoop, and was limited in reaching in all directions. (Tr. 241-44.) Larson also indicated that Bailey's ability to push and/or pull was limited in the lower extremities, his motor strength was 3/5 to 4/5, and his range of motion was limited in several areas, including that his straight leg raising was limited to twenty degrees on the left leg and thirty degrees on the right leg. (Tr. 241, 245-46.)

Bailey had back surgery[13] on July 15, 2005, and was discharged on July 17 with a back

---

[13] Specifically, Bailey underwent L4-5 and L5-S1 diskectomy with posterior instrumentation. (Tr. 247, 252, 254.)

brace and walker.  (Tr. 249, 252-54.)  From August through December 2005, Bailey had several appointments to check on his progress following surgery.  (Tr. 247-48, 281-84.)  He reported that he was continuing to have leg pain that radiated down to his legs and occasional back spasms. (Tr. 247, 281, 283.)  His motor strength ranged from a 3/5 to a 4/5 and his sensation was found to be within normal limits.  (Tr. 247, 281.)  In addition, x-rays indicated that his back was "healing well."  (Tr. 247.)  In August 2005, Bailey was seen wearing a "corsette brace" walking with an "antalgic[14] gait."  (Tr. 283.)  On December 23, 2005, Bailey reported during an examination that he had fallen several weeks earlier, which resulted in increased leg pain.  (Tr. 281.)  An x-ray showed that his hardware was still in place.  (Tr. 282.)

On December 19, 2005, Cremona Frederick[15] completed an RFC Assessment for the time period of "12 Months After Onset: 07/14/2006" in which she diagnosed Bailey with "S/P L4-L5 Dis[k]ectomy[16] and L4-S1 Diskectomy."  (Tr. 271-78.)  Frederick signed the form electronically in the box titled "Medical Consultant."  (Tr. 278.)  In the RFC Assessment, Frederick indicated that Bailey could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and had the unlimited ability to push and/or pull.  (Tr. 272.) She also stated that Bailey could occasionally climb a ramp or stairs, stoop, and crouch, but that he could never climb ladders, ropes or scaffolds.  (Tr. 273.)  She further noted, "PE Motor

---

[14] Antalgic means counteracting or avoiding pain.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 98 (31st ed. 2007).

[15] There is no indication on the RFC Assessment that Frederick is a physician or other medical professional.

[16] A diskectomy is an excision of an intervertebral disk.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 553 (31st ed. 2007).

strength 4/5 proximal leg, B; 5/5 distal, sensation decreased [sic] in lateral aspect of foot bilat."

(*Id.*)  Frederick indicated that her opinions were based on examination records from June 24,

2005, July 1, 2005, and July 15-17, 2005.  (Tr. 273.)

During an examination of Bailey on April 5, 2006, the doctor noted that Bailey's overall

pain was better, he was now able to walk, and his strength was a 4/5.  (Tr. 269-70.)  On April 12,

2006, Yvonne Post, D.O., completed an RFC Assessment for a "current evaluation" in which she

indicated that Bailey could occasionally lift and/or carry twenty pounds, frequently lift and/or

carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit

for a total of about six hours in an eight-hour workday, occasionally climb a ramp or stairs,

balance, stoop, kneel, crouch, and crawl, but never climb a ladder, rope or scaffolds.  (Tr. 295-

302.)  She also noted that Bailey had the unlimited ability to push and/or pull.  (*Id.*)  Post

indicated that her opinions were based on examination records from July 1, 2005, August 24,

2005 and November 30, 2005, and she stated that the "alleged limitations are partially supported

by EOR."  (Tr. 296-97, 300.)

On January 25, 2007, Bailey underwent several MRIs.  Based on the MRI results of the

cervical spine, Terri Allen, M.D., opined:

> 1.    Marked disc space narrowing, disc degeneration and diffuse posterior spondylosis at C6-7 with a diffuse posterior traction disc bulge and more focal 7 mm right paracentral/posterolateral disc protrusion—resulting in significant canal stenosis and marked bilateral foraminal stenosis at this level.
>
> 2.    Moderate disc space narrowing, disc desiccation and diffuse posterior spondylitic spurring at C5-6 with a diffuse 5 mm posterior traction disc bulge—resulting in canal stenosis and moderate bilateral foraminal stenosis at this level.
>
> 3.    Disc space narrowing, disc desiccation and diffuse posterior spondylitic ridging at C4-5 with a diffuse posterior 5 mm traction disc bulge—

resulting in canal stenosis, mild right foraminal stenosis and moderate left foraminal stenosis at this level.

4.      Mild posterior spondylitic spurring and diffuse 4 mm posterior traction disc bulge at C3-4—resulting in borderline canal stenosis and mild left foraminal stenosis at this level.

5.      Focal left uncovertebral spurring at C2-3 resulting in moderate left foraminal encroachment at this level.

(Tr. 334.)  Based on the MRI results of the lumbar spine, Allen opined:

1.      Post-Operative Changes at L4-5 and L5-S1 as described with normal alignment maintained—no evidence of focal disc protrusion, canal stenosis or foraminal encroachment at these levels.

2.      Mild diffuse annular bulge at L3-4 and at L5-S1 without focal disc protrusion.

(Tr. 335.)

2.  Administrative Hearing

Bailey was born on February 9, 1964, and he has a high school diploma.  (Tr. 27, 105.) He claims he injured his back and neck playing football in 1989.  (Tr. 19.)  Bailey last worked in 1991 as an automotive mechanic.  (Tr. 18.)   He was sent to prison in 1991 for theft of an automobile and released in 1992.  (Tr. 18-19, 107.)

At the May 3, 2005 hearing, Bailey testified that he has extreme pain in his back, legs, shoulders, and neck, and that he could lift twenty to twenty-five pounds, has difficulty walking due to back pain and numbness of his legs, and can only walk fifty to one hundred yards.  (Tr. 18, 345-46, 349.)  He also testified that he cannot climb stairs and that he has tingling in his fingers, which causes him to drop things.  (Tr. 18, 350.)

At the February 27, 2007, hearing, Bailey testified that he recently had back surgery.  (Tr.

18, 364.)  He also testified that since the surgery he can walk fifty yards but that he has to use a

walker every day.  (Tr. 18, 366, 372, 375-76.)  He also stated that he can lift about twenty-five

pounds and is taking medication for the pain.  (Tr. 19, 376).  He indicated that since the surgery

he had been treated by Roberto Carderelli, M.D., because he was having problems with his legs,

feet, back, arms, losing grip, falling down, and headaches, and that he was taking hydrocodone

for the pain.  (Tr. 365, 370-71.)  He further stated that his doctor told him he needed several

spinal surgeries on his neck and upper and middle back and that he had several bulging discs.

(Tr. 19. 272-73.)  He testified that during the day he swept the house, washed a few dishes,

watched TV, read books and, on occasion, would go visit a friend who lived close by for a few

hours.  (Tr. 377-78.)

The ALJ found that Bailey had not engaged in substantial gainful activity since

November 1, 1992.  (Tr. 17.)  The ALJ also found that Bailey's severe impairments included the

following:

> [C]hronic back and neck pain with radiculopathy; impairment status-post
> disc desiccation and disc protrusions at L4-5 and L5-S1 with lateral recess
> stenosis, foraminal narrowing, and facet arthrosis; impairment status-post an L4-5
> and L5-S1 discectomy and fusion surgery; spondylosis, disc desiccation, and disc
> bulges throughout the cervical spine, causing significant canal stenosis and
> marked foraminal stenosis at C6-7, canal stenosis and moderate foraminal
> stenosis at C5-6, borderline canal stenosis and mild left foraminal stenosis at C3-
> 4, and moderate encroachment at C2-3; major depression; and rule out borderline
> intellectual functioning.

(Tr. 17.)  However, the ALJ found that Bailey had no impairments or combination of

impairments that met or equaled the severity of any listed impairment.  (Tr. 17, 18-24.)  In

reaching this finding, the ALJ stated:

> The objective medical evidence fails to establish that Mr. Bailey's

impairments, either individually or in combination, meet or equal the requirements of sections 1.04, 12.04 or 12.05, or any other section of the Listing of Impairments, as it fails to establish the required severity. In reaching this finding, I considered the opinions of the State agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion.

(Tr. 17.)

The ALJ further found that Bailey had no past relevant work and that he had the following residual functional capacity (RFC) for all periods, including from his alleged onset date through September 30, 1994, when his insured status expired, and for the times since the filing dates of his SSI applications: lift and carry twenty pounds occasionally; lift and carry ten pounds frequently; stand and walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; periodically alternate sitting and standing to relieve pain or discomfort; never climb ladders, scaffolds, or ropes or crawl; occasionally balance, kneel, crouch, and stoop; understand, remember and carry out short, simple instructions and make judgments on short, simple work-related documents; occasionally interact with the public; interact appropriately with supervisors and co-workers; and respond appropriately to usual work pressures and changes in the work setting. (Tr. at 17-18, 380-81.)

In reaching his decision, the ALJ considered, *inter alia*, the opinions of Weston and Larson. He did not give controlling or significant weight to Weston's opinions because they were not consistent with the treatment records and examination findings. (Tr. 22.) He questioned why Bailey was walking so much in November 2003 and doing heavy lifting in December 2003 if he had such extreme, disabling pain. (Tr. 22.)

Although the ALJ agreed with Larson's conclusion that Bailey needed a sit/stand option

15

and could never climb, he did not give significant weight to Larson's other limitations because they were not supported by the evidence.  (Tr. 23.)  He noted that, although Larson opined that Bailey could only lift ten pounds occasionally, Bailey himself had testified he could lift up to twenty-five pounds.  Furthermore, the ALJ found that Larson's examination occurred just a couple of weeks prior to Bailey's surgery, so that the post-surgery improvement could not yet been seen.  (Tr. 23.)  In addition, the ALJ pointed to other medical evidence in the record that showed Bailey was actually functioning better than Larson's examination revealed.  (Tr. 23.)

A vocational expert testified at the hearing that there were jobs an individual limited to the above-described RFC would be able to perform.  (Tr. 27-28, 380-82.)  In addition, the vocational expert testified that there would be jobs available even if the individual no longer had a sit/stand option, but could walk and stand no more than two hours in an eight-hour day with the use of either a walker or cane.  (Tr. 28, 381-82.)  Accordingly, the ALJ found that Bailey was not disabled for purposes of disability insurance benefits or SSI payments.  (Tr. 28-29.)

E.     DISCUSSION

1.   December 2005 State Agency Medical Opinion

Bailey argues that it was error for the ALJ to rely on the December 2005 state agency medical opinion by Frederick to support the ALJ's decision that Bailey was not disabled because of two reasons: (1) it was not signed and does not indicate that it was authored by a physician as required by Social Security Ruling ("SSR") 06-03p and (2) it does not address all of the period after the alleged onset in 1992 and after the applications for SSI were filed in 2003 and 2005. (Pl.'s Br. at 5.)

The Commissioner, on the other hand, argues that the ALJ adequately developed the

record and correctly found that Bailey was not disabled as to all relevant dates.  (Def.'s Resp. at 9-11.)   The Commissioner does not dispute that the December 2005 state agency medical opinion was not appropriately signed; however, he argues that such error was harmless because there is substantial evidence in the record that supports the ALJ's decision.  (Def.'s Resp. at 4-13.)  Specifically, the Commissioner notes that the December 2005 state agency medical opinion was based on medical evidence from June and July 2005 and such evidence was also considered in an RFC Assessment dated April 12, 2006 that was properly signed by Yvonne Post, D.O., an appropriate medical source.  (Def.'s Resp. at 13.)

The ALJ is to consider all relevant evidence in the case record in making his decision regarding the plaintiff's claims.  20 C.F.R. §§ 404.1512, 416.912.  To establish that a claimant has a medically determinable impairment, there must be evidence in the record from acceptable medical sources.   20 C.F.R. §§ 404.1513, 416.913; *see also* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2); SSR 06-03P, 2006 WL 2329939, at *2 (SSA August 9, 2006) (stating that "only 'acceptable medical sources' can give . . . medical opinions").  Acceptable medical sources are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  20 C.F.R. §§ 404.1513(a), 416.913(a).

The ALJ, in making his decision that Bailey was not disabled, reviewed the medical and other evidence in the record.  In his decision, the ALJ states, *inter alia*, that "the [December 2005] State agency physician's opinion supports the conclusion that Mr. Bailey was not disabled and could do at least light work, since the ability to do medium work includes the ability to do light work."  (Tr. 24.)  A review of the December 19, 2005 RFC Assessment referred to by the ALJ shows that it was electronically signed by Cremona Frederick; however, there is no

17

indication that Frederick was a physician or other acceptable medical source.  Thus, the ALJ

erred when he relied on this opinion as a medical opinion because there is no evidence that it is

from an acceptable medical source as required by the regulations.

Violation of a regulation constitutes error and establishes a basis for reversal of the

agency action and remand unless a reviewing court finds that the error is harmless.  *Frank v.*

*Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).  Harmless error exists when it is inconceivable that

a different administrative conclusion would have been reached absent the error.  *Id.* at 622.

In this case, Bailey has failed to show the ALJ would have reached a different conclusion

even if the ALJ had not relied, in part, on the 2005 RFC Assessment from Frederick.  There is

substantial other evidence in the record that covers the time periods relevant to all of Bailey's

claims, as spelled out in section D. *supra*, that the ALJ also relied on that supports the ALJ's

decision.[17]  Remand, therefore, is not appropriate.[18]

---

[17] One such piece of medical evidence that the ALJ relied on is the RFC Assessment dated April 12, 2006 in which Post opined that Bailey could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and occasionally balance, stoop, kneel, crouch, crawl, or climb a ramp or stairs.  Post also opined that Bailey had the unlimited ability to push and/or pull and could never climb a ladder, rope, or scaffolds.  (Tr. 297.) She also indicated that the "alleged limitations are partially supported by the EOR."  (Tr. 300.)

Although Bailey acknowledges that Post's opinion is in the record, he argues that it cannot be relied upon as substantial other evidence supporting the ALJ's decision because the "ALJ's decision does not indicate that the judge read or considered the opinion, because neither D[r.] Post nor her Assessment are mentioned in the decision either by name or by reference to the date of the opinion."  (Pl.'s Reply at 2.)  Bailey's assertion, however, is incorrect.  The ALJ, in his April 26, 2007 decision, states:

> In April 2006, the State agency physicians who reviewed Mr. Bailey's subsequent SSI application at the reconsideration level also found he was capable of doing light work (lift 20 pounds occasionally and 10 pounds frequently, sit about 6 hours in an 8-hour workday, stand and walk about 6 hours in an 8-hour workday, and unlimited pushing and pulling, with no climbing ladders, scaffolds, or ropes, and only occasional postural activities).  His alleged limitations were considered only partially supported by the medical record.

(Tr. 24.)  It is clear after reviewing Post's RFC Assessment that the ALJ was referring to her opinion when he made the above statements and such opinion is medical evidence that supports the ALJ's decision.

18

2.  Medical Equivalency

Bailey also argues that the ALJ erred when he failed to obtain an acceptable medical source opinion from a designated state agency physician on the issue of medical equivalency as to Bailey's claims for SSI.  The Commissioner argues, on the other hand, that the ALJ was not legally required to obtain an updated medical opinion on the issue of medical equivalency. (Def.'s Resp. at 9-12.)

As a threshold matter, the ALJ is responsible for ultimately deciding the legal question whether a listing is met or equaled.  SSR 96-6p, 1996 WL 374180, at *3 (S.S.A. July 2, 1996). Whether a claimant's impairment meets the requirements of a listed impairment is usually more a question of medical fact than opinion because most of the requirements are objective and simply a matter of documentation, but it is still an issue ultimately reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at *3 (S.S.A. July 2, 1996); *see also* 20 C.F.R. § 404.1526(c) (stating that opinions that medical consultants designated by the Commissioner offer on the issue of whether an impairment meets or equals the requirements for a listed impairment will be considered); 20 C.F.R. §§ 404.1527(e), 416.926(c) & (e), 416.927(e).   Medical equivalence must be based on medical findings that are supported by medically acceptable clinical and

---

[18] The Court notes that there is a different, albeit similar, standard of review when there is a violation of a social security ruling as opposed to a violation of a regulation.  Violation of a regulation invokes a "harmless error" analysis whereas violation of a ruling invokes a "prejudice" analysis.  *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 838 (N.D. Tex. 2008) (stating that "[p]rejudice and harmless error analysis, although similar in substance, are different procedurally").  "Remand for failure to comply with a [social security] ruling . . . is appropriate when a complainant affirmatively demonstrates ensuant prejudice."  *McNair*, 537 F. Supp. 2d at 838 (citing  *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)).  "A claimant can show prejudice by showing that adherence to the ruling might have led to a different decision."  *Id*. (citing  *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)).

In this case, the Court concludes that regardless of whether a social security ruling or regulation had been violated by the failure of Frederick to properly sign the RFC Assessment, the result would be the same under either the harmless error or the prejudice analysis for the reasons stated *supra*.

laboratory diagnostic techniques.  20 C.F.R. §§ 404.1526, 416.926.   SSR 96-6p, which provides

that this requirement is satisfied by the signature of a state agency medical consultant on the

approved DDT form, states in pertinent part:

> The signature of a State agency medical or psychological consultant[19] on an SSA-
> 831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5 or SSA-
> 833-U5 (Cessation or Continuance of Disability or Blindness) ensures that
> consideration by a physician (or psychologist) designated by the Commissioner
> has been given to the question of medical equivalence at the initial and
> reconsideration levels of administrative review.  Other documents, including the
> Psychiatric Review Technique Form and various other documents on which
> medical and psychological consultants may record their findings, may also ensure
> that this opinion has been obtained at the first two levels of administrative review.
> When an administrative law judge finds that an individual's impairment(s) is not
> equivalent in severity to any listing, the requirement to receive expert opinion
> evidence into the record may be satisfied by any of the foregoing documents
> signed by a State agency medical or psychological consultant.

SSR 96-69, 1996 WL 374180, at *3.

In addressing whether Bailey's impairments met or equaled the severity of the Listing of

Impairments ("Listing"), the ALJ concurred with the opinions of the state agency medical

consultants on the DDT forms that Bailey had no such impairments.  *See* 20 C.F.R. §

404.1526(b).  In making this decision, the ALJ stated:

> The objective medical evidence fails to establish that Mr. Bailey's
> impairments, either individually or in combination, meet or equal the
> requirements of sections 1.04, 12.04 or 12.05, or any other section of the Listing
> of Impairments, as it fails to establish the required severity.  In reaching this
> finding, I considered the opinions of the State agency medical consultants who
> evaluated this issue at the initial and reconsideration levels of the administrative
> review process and reached the same conclusion.

(Tr. 17.)

A review of the record shows that it contains two DDT forms (Forms SSA-831-U3), one

---

[19]A medical consultant must be an "acceptable medical source."  20 C.F.R. §§ 404.1526(d), 416.926(d).

dated November 18, 2003 and one dated March 4, 2004, both of which bear signatures of a disability examiner and physician and indicate that Bailey was not disabled through September 30, 1994.   (Tr. 33-34.)  Based on the language of SSR 96-6p, this evidence is proof that ALJ did consider a determination by medical experts that the claimant's impairments did not equal a listing.  *See, e.g., Nemoede v. Astrue*, No. 2:05-CV-0129,  2008 WL 4332521, at *3-4 (N.D. Tex. Sept. 22, 2008).   These two forms[20] discharge the Commissioner's basic duty to obtain medical-expert advice concerning the medical equivalency question.  *See* SSR 96-6p.

Bailey claims, however, that there is no support for the ALJ's decision regarding medical equivalency with respect to his *SSI claims* because there is no state agency physician's opinion or DDT form that considers the time period *after September 30, 1994*.[21]  While the court agrees that two DDT forms that the ALJ refers to on as the issue of medical equivalency consider only the time period through September 30, 1994,  SSR 96-6p requires the ALJ to obtain an updated medical opinion from a medical expert as to the issue of equivalency only in the following two circumstances:   (1) if the ALJ concludes that the claimant does not meet the specific criteria outlined in the Listing but reasonably believes claimant's impairments may be judged equivalent, or (2) the ALJ receives additional medical evidence that he believes may change the state agency medical or psychological consultant's findings that the impairments are not equivalent in severity

_____

[20]The Court notes that the two forms relied on by the ALJ were not technically SSA-831-U5 forms, as specified by SSR 96-6p.   However, they appear to serve the purpose described in SSR 96-6p.  *See, e.g.,  Field v. Barnhart*, No. 05-100-P-S, 2006 WL 549305, at *3 n.2 (D. Me. March 6, 2006).

[21]With respect to applications for disability insurance benefits, the plaintiff must show that his period of disability began as of or prior to the date his insured status expired.   *See* 42 U.S.C. §§ 416(i), 423(c).   Any impairment that had its onset or became disabling after a plaintiff's insured status expired cannot serve as the basis for a finding of disability.  *See Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).   With respect to applications for SSI, the first month for which SSI benefits can be paid is the month after the SSI application was filed regardless of how far back in time disability may extend.   42 U.S.C. § 1382; 20 C.F.R. § 416.335.

to any impairments in the Listing.  SSR 96-6p, 1996 WL 374180, at *4.

Bailey argues that the following new evidence that was not reviewed by the state agency physicians on the DDT forms shows that Bailey meets or equals Listing 1.04A[22] for disorders of the spine:  (1) Larson's July 2005 report that Bailey had lumbar flexion limited to 40 degrees out of a possible 90; (2) records of three examiners noting muscle weakness to be 3/5 from April 2004 to December of 2005; and (3) examination notes from June 24, 2005 that Bailey had "straight leg test positive at 10 on the left and 20 on the left and [decreased] sensation at lateral foot."  (Pl.'s Br. at 7-8.)

The ALJ, in making his decision regarding medical equivalency, noted, *inter alia*, that the objective medical evidence failed to establish that Bailey had an impairment or combination of impairments that met or were medically equivalent to one of the impairments in the Listing.  In his decision, the ALJ noted:

> The medical record prior to the expiration of his insured status on September 30, 1994, indicated his strength was normal (5/5) or only very slightly decreased (4+/5.)  The medical record at and since September 2003, when his first SSI application was filed, and before his back surgery, also indicates his strength tested as normal or only mildly reduced (4/5 to 5/5).  The medical record after his surgery generally indicates the same level of strength. . . .

> . . . .

---

[22] Listing 104A states:

  1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord.  With:

  A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)

20 C.F.R. Part 404, Subpart P, App. 1, § 1.04A.

At a follow-up examination in April 2006, Mr. Bailey reported his pain was better with walking, and he used a cane rather than a walker. The treatment notes at that time do not indicate he was chastised for using the cane and not the walker, or that he was told he needed to use the walker, as Mr. Bailey testified. Mr. Bailey had a positive straight-leg raising test and decreased sensation of his feet, but his strength remained good (4/5), and x-rays indicated the fusion had good alignment and satisfactory position. . . .

. . . .

In January 2007, an MRI of Mr. Bailey's lumbar spine showed post-operative changes at L4-5 and L5-S1 with normal alignment and no evidence of disc protrusion, stenosis, or foraminal encroachment. There was a mild diffuse disc bulge at L3-4 and L5-S1 without focal disc protrusion . . . . The radiographic testing of his lumbar spine does not indicate circumstances that would reasonably cause the disabling back pain he alleged at the hearing. An MRI of his cervical spine showed marked disc space narrowing, disc degeneration, and diffuse spondylosis at C6-7 with a diffuse traction disc bulge resulting in significant canal stenosis and marked foraminal stenosis. There also were moderate abnormalities and stenosis at several of the remaining levels of the cervical spine . . . . However, no surgery has been scheduled, and the treatment records do not indicate Mr. Bailey has exhibited significant limitations to the use of his upper extremities.

(Tr. 24.)

Based on evidence in the record, the ALJ found that Bailey's impairments did not met or equal any of the impairments in the Listing. In addition, the opinion of the ALJ and the record indicate that the ALJ did not reasonably believe Bailey's impairments might be judged equivalent or that the additional medical evidence regarding Bailey's impairments might change the state agency medical consultants' findings that such impairments were not medically equivalent to any impairment in the Listing. *See, e.g., Foley v. Barnhart*, 432 F. Supp. 2d 465, 483 (M.D. Pa. 2005) (stating that although opinions of the Disability Determination Service Consultants may have been a bit outdated, it is within the ALJ's discretion to find that no new

medical opinion was required on the issue of medical equivalency).  Thus, the ALJ was not required to get an updated medical opinion on the issue of equivalency to address the period of time after September 30, 1994.  Because the issue of medical equivalence is reserved to the Commissioner, the ALJ complied with SSR 96-6, and there is substantial evidence in the record supporting the ALJ's determination regarding medical equivalency, there is no basis for remand on this issue.  *See, e.g., Thomas v. Astrue*, No. 6:07-CV-053-C, 2009 WL 2777867, at *5 (N.D. Tex. Aug. 31, 2009).

    3.  Opinions of Weston and Larson

      a.  Opinion of Weston, Bailey's Treating Physician

Bailey claims that the opinion of Weston, his treating physician, should have been given greater weight because he was a licensed physician that had been treating Bailey for a period of eight months.  (Pl.'s Br. at 7-8.)  Controlling weight is assigned to the opinions of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir. 1983).  However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise supported by the evidence.  *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).  *See also* 20 C.F.R. § 404.1527(e).  Conclusory statements to the effect that the claimant is disabled or unable to work are legal conclusions, not medical opinions, and are not entitled to any special significance.  *See*

20 C.F.R. §§ 404.1527(e), 416.927(e); *see also Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

Despite the weight given to the treating source's opinion, the ALJ must evaluate every medical opinion received.   20 C.F.R. §§ 404.1527(d); 416.927(d).   Pursuant to 20 C.F.R. § 404.1527(d), unless a treating source's opinion is given controlling weight, the following factors are considered in deciding the weight to give to any medical opinion: (1) examining relationship, (2) treatment relationship, including the length, nature and extent of the treatment relationship, as well as the frequency of the examination(s), (3) supportability, (4) consistency, (5) specialization, and (6) other factors which "tend to support or contradict the opinion."   20 C.F.R. § 404.1527(d) (2009); *see also* SSR 96-6p; 20 C.F.R. § 416.927(d) (2009).

In his decision, the ALJ specifically considered the opinion of Weston, Bailey's treating physician, who opined that Bailey was disabled and that he was unable to walk, stand, or sit for more than 1-2 hours.   (Tr. 22; *see* Tr. 210.)   The ALJ did not attach controlling or significant weight to Weston's opinions because they were not consistent with the treatment records and examination findings.   (Tr. 22.)  The ALJ acknowledged that Weston was Bailey's treating physician for a period of time from 2003 through 2004.   The ALJ found, however, that Weston's statements were inconsistent with other evidence in the record that showed the following:   (1) Bailey was walking and doing heavy lifting despite his pain, (2) Bailey's sensation was intact and his reflexes were normal, (3) he had been noncompliant with his instructions, and (4) his back surgery was not performed for over a year after it was

recommended.[23]   (Tr. 22.)   Although Bailey disagrees with the ALJ's characterization of Weston's report, the ALJ provided specific reasons for discounting Weston's opinions that are supported by substantial evidence in the record  and affirmed that he had "considered opinion evidence in accordance with the requirements of 20 C.F.R. §[] 404.1527." [24]   (Tr. 18, 22.)  Thus, remand is not required because the ALJ recognized and complied with his duty to weigh the medical opinions of record, and he articulated good cause for not assigning controlling weight the treating source's opinions.

---

[23] The court notes that the ALJ is only required to perform a detailed analysis of the treating physician's views under the factors set forth in 20 C.F.R. § 404.1527(d) if there is no other reliable medical evidence from a treating or examining physician that controverts the treating specialist.  *See Newton v. Apfel*, 209 F.3d 448, 455-57 (5th Cir. 2000).  In other words, an ALJ does *not* have to perform a detailed analysis under the factors in the regulation "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" as well as cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion."  *Id*. at 458; *see Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 507-11 (S.D. Tex. 2003); *Contreras v. Massanari*, No. 1:00-CV-242-C, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001) ("The Court's decision in *Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant.").

In this case, the ALJ cited medical evidence from other physicians that examined Bailey, including from examinations in March and April 2004, that did not support the conclusions expressed by Weston.  (Tr. 22.)  Thus, the ALJ was not required to provide a detailed analysis of the 20 C.F.R. § 404.1527(d), even though the Court finds that the ALJ did provide an analysis of such factors.  *See, e.g., Harris v. Astrue*, No. 5:07-CV-154-C, 2008 WL 1820463, at *3  (N.D. Tex. April 23, 2008) (stating that the ALJ is required to consider the treating physician's opinion under the six factors set forth in 20 C.F.R. § 404.1527(d) only in those cases where there are no opinions from other treating or examining physicians that would contradict the treating physician's opinion).

[24] Bailey claims that Weston's opinion that Bailey could not walk or stand more than 1 to 2 hours was consistent with Bailey's report that he had some blood in his stools after he had walked less than a mile and engaged in heavy lifting. (Pl.'s Reply at 4; *see* Tr. 22.)  Bailey argues that the ALJ should have asked Bailey questions about how far he could walk in December of 2003.  (Pl.'s Reply at 4-5.)  However, the court concludes that Bailey is misinterpreting the statements made by the ALJ and that there is substantial evidence in the record to support the ALJ's conclusion that Weston's opinion was not entitled to "controlling or significant weight."  Weston opined that Bailey could not walk or stand more than one to two hours and that he was disabled.  The ALJ discounted Weston's opinion not because of the specific distance of the walking, but because of evidence in the record that Bailey was engaging in walking and heavy lifting even as he claimed he had severe, disabling back pain.  (Tr. 22.)

b.  Opinion of Larson

Bailey also claims that the ALJ erred by not developing the record to show that Larson, an examining physician for the state agency, was a specialist, which is one of the five factors that the ALJ must consider when evaluating any medical opinion pursuant to 20 C.F.R. § 404.1527(d).  *See also* 20 C.F.R. § 416.927(d).  The ALJ, in his decision, noted that Bailey underwent a consultative examination with Larson in July 2005.  (Tr. 23.)  The ALJ stated that he agreed with Larson's conclusion that Bailey needed a sit/stand option and could never climb. (Tr. 23.)  The ALJ, however, disagreed with Larson's other suggested limitations because they were not supported by the evidence.  (Tr. 23.)  Specifically, the ALJ noted that Larson's examination occurred just a couple of weeks before Bailey's back surgery, before any improvement as a result of the surgery could be seen and that a pre-surgery examination in June 2005 indicated that Bailey was actually functioning better than indicated by Larson.  (Tr. 23.)

Although the ALJ did not specifically discuss whether Larson was a specialist, "there is no statutorily or judicially imposed obligation for the ALJ to list explicitly all the evidence he takes into account in making his findings."  *Hammond v. Barnhart*, 124 Fed.Appx. 847, 851 (5th Cir. 2005); *see Gonzales-Sargent v. Barnhart*, No. SA-06-CA-0355-XR, 2007 WL 1752057, at *8 (W.D. Tex. June 15, 2007).  Case law, as discussed *supra*, states an ALJ must perform a detailed analysis of a *treating physician's* views under the factors set forth in 20 C.F.R. § 404.1527(d)(2) before the ALJ can reject a treating physician's opinion unless there is reliable medical evidence from another treating or examining physician that contradicts the treating physician's opinion.  *See Newton*, 209 F.3d at 455-58.  However, in this case, Larson was not Bailey's treating physician.  Thus, the ALJ only had "to consider-not list explicitly-in [his]

27

decision" the factors in 20 C.F.R. § 404.1527(d).  *Gonzales-Sargent*, 2007 WL 1752057, at *9;

*see Lewis v. Barnhart*, No. CIV-A-H-05-1259, 460 F. Supp. 2d 771,  (S.D. Tex. 2006) (stating

that because a physician was only a consultative examiner, the ALJ was not required to provide

the detailed analysis of the factors set forth in 20 C.F.R. § 404.1527(d)).  Because the ALJ

complied with his duty, there is no basis for remand on this issue.

<u>RECOMMENDATION</u>

It is recommended that the Commissioner's decision be affirmed.

<u>NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT</u>

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file

specific written objections in the United States District Court to the United States Magistrate

Judge's proposed findings, conclusions and recommendation within ten (10) days after the party

has been served with a copy of this document.  The court is hereby extending the deadline within

which to file specific written objections to the United States Magistrate Judge's proposed

findings, conclusions and recommendation until October 26, 2009.  The United States District

Judge need only make a *de novo* determination of those portions of the United States Magistrate

Judge's proposed findings, conclusions and recommendation to which specific objection is

timely made.  *See* 28 U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific

written objection to a proposed factual finding or legal conclusion will bar a party, except upon

grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual

findings and legal conclusions accepted by the United States District Judge. *See Douglass v.

United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until October 26, 2009 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED OCTOBER 5, 2009.


___/s/  Charles Bleil_____
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE

29